Good morning, Your Honors, and may it please the Court, my name is Mark Ebert, and I represent Mr. Paul Wagner. I'd like to start with the issue, the closely related issues of the number of victims and the amount of loss. There are a large number of reasons why the government didn't meet its burden of proving either the number of victims or the amount of the loss, leading to the great majority of the sentence against Mr. Wagner in this case. First, as the Court knows, the trial involved allegations that Mr. Wagner defrauded four lenders in the sale of 11 homes. The only way the government gets to more than 10 lenders and $18 million over the sale of 80-some homes is by including every single home that his company sold for a period of two years, regardless of who the lender was and regardless of whether there was any evidence of fraud in any of those specific transactions. First of all, it's undisputed that some lenders, like AmTrust, and this is according to the government's own witness, did not object to sellers giving incentives to buyers, such as down payments and mortgage payments, for some period of time. And also, as stated by the government witness, that was a practice that used to be common in the industry for some period of time. But 64 of the loans that Mr. Wagner was sentenced for having defrauded people on were from lenders other than those that were involved in the trial. And the government offered no evidence at all as to whether any of those lenders did or did not allow the kinds of incentives that Mr. Wagner gave in this case or whether or not those incentives were disclosed in those cases. Did those have to be listed in the indictment? I'm sorry? Did those have to be listed in the indictment? No. The indictment was 11 loans from four lenders. But you're saying it's limited to four lenders because that's all is alleged? Well, it's limited to four lenders because that not only is all that was alleged, but those were the only ones where their practices and what they would allow as incentives were provided as evidence either at trial or at sentencing. So if some lenders allowed these incentives and some didn't, and we've got evidence about four lenders, and then you've got lenders on 64 other loans, I don't remember how many, but it was a large number, but there's no evidence at sentencing or at trial as to what they allowed and didn't allow, that's the first failure of proof. And, again, clear and convincing evidence is the standard here because this amount of loss is, I think it's eight and a half of the 14 years of the sentence here. Counsel, what is your response to the submission of Exhibits C, D, and E at sentencing, which were intended to respond to this argument in front of the district court purporting to show either kickback payments to co-conspirators or mortgage payments to the lender for all of the listed items? What they showed, and this was, I don't remember the exhibit number, but the loss exhibit that the government provided only shows that the amount of loan, the amount of sale to subsequent lenders, and the amount of the foreclosure. They do not show evidence that Mr. Wagner defrauded each of those lenders. That was not offered at trial or at sentencing. I had one other question about the sentencing enhancement. The district court found that the loss was something around $18 million, if I recall correctly, and the appropriate guideline is a range from 7 to 20. So even if you're right, can you show that it would be below 7? Yes, Your Honor. The defense argued and provided their calculations to the effect that the loss to the 11 that were shown or arguably shown, that's a different issue, to have been defrauded was only $358,000. And there are a number of reasons why there's that huge difference, but one of them is that the government and the district court used the wrong method to calculate the loss, something that's reviewed de novo. Basing it on the original loan amount minus the- But that's actually a different question. If you're wrong about the method, if you're wrong about the method, but you're talking only about the number of transactions involved, which was your other separate argument, where do you fall in the sort of $7 million and above or below? Do you understand my question? I'm trying to separate out your argument about the methodology from your argument about the number of transactions that can be included. Well, I think that, first of all, I think which transactions are to be included goes both to the clear and convincing evidence as to support it and to the methodology. Okay, but my question about the $7 million is, assuming that the methodology is correct, would you have to knock out every single one of those other transactions to get below $7 million, or would you get there at all? You would have to knock out every single one of the 71 extra transactions where there was no evidence of fraud and where there was no evidence that those particular banks would have objected to the incentives that Mr. Wagner offered. And these were incentives that were advertised on television, radio, billboards, flyers. There was nothing secret about that. But I think that, and I understand that these are somewhat separate issues, but I think they're related because the methodology that was used was also wrong. The methodology that was used to calculate loss was the original loan amount minus the sale price at foreclosure, which is something that happened years later and after the loans were resold to other lenders. And if you look at United States v. James, which is a case that I think is very important here, that says that in cases involving lenders who sold fraudulently acquired loans to successive lenders, subtracting the foreclosure sales prices from the original loan amounts is not a reasonable method of calculating the original lender's loss. And the reasons are two. One, it doesn't take into account what the successor lenders paid for the loans. And, two, the losses to those successor lenders were not reasonably foreseeable to the defendant. And I think that applies here. Really? Yeah. You can't foresee that the loans will be sold? You can't foresee what the losses will be to any successor lenders. Those loans are sold. Even if you're defrauding the first one? Yeah, because for one thing, yes, I do say that. Because for one thing, there's an attenuation as to time. We're talking about years later. I think the fraud was supposedly 2007 to 2009. Some of these sales were in 2011 and 2012. Secondly, the Berger case, U.S. v. Berger, and the guidelines require the losses to be the result of the fraud. But there are a lot of things that happened between the original loan, the resale of the loan, the foreclosure of the loan, and the sentencing, which the Guideline 2B1.1 says is what you have to, the time you have to measure the loss, that had nothing to do with the fraud. Nor do we know, because there was no evidence presented by the government at trial or at sentencing, as to the — whether or not the successor lenders took these loans either with knowledge of the fraud or with knowledge of anything else that affected the value of those loans. It's too attenuated. And that is what the James Court said. And they concluded that to the extent any original lender sustained any actual loss, that's the difference between the outstanding balance on the loan and what the lender received when it sold the loan, meaning to the successor lenders. So that's why I think that doesn't apply. Your client got a below-guideline sentence. Mm-hmm. And what if we say you're on the amount, the loss amount, what if we agreed with you, what would that bring the sentence down to? It would bring it down to leaving aside any guideline variance. Five and a half years, Mr. Wagner would be home by now. And I've had a number of other cases, of course, as has Your Honor, where there was a variance. And since you start with the guidelines, you would assume or at least not assume contrary that the court would also have varied downward from whatever the new guideline range is based on whatever the original reduction was for. What are you saying the guidelines range would be? I had that calculated. I don't remember the range, but I remember that the loss alone reduces it from 14 years to five and a half years. There's another reason. Let's see. There's another reason that these guidelines were inaccurately calculated, and that is that the district court didn't take into account either the amount that Wagner Holmes paid to reduce the balance of the loans, which Mr. Wagner argued was in the millions, and there was no factual finding either way or no evidence to contradict that. And even the government acknowledges that some sales that occurred during that period were not fraudulent. And there was no attempt by the government or the district court to determine which of those there were or how many of those were. And there's no reason to think that there would have been. All the government really relies on in saying, gee, we can count every home sold during that entire two-year period as being fraudulent, is that the company used a company bank account. There was no evidence that there was different bank accounts used for fraudulent versus non-fraudulent loans, and companies use bank accounts to make their payments, and that there was a servicing company that was used to make payments on the mortgages. Again, that is standard business practice. There's no evidence that only fraudulent loans were paid that way. I have three minutes left. If there's no more questions, I'd like to reserve. May it please the Court. Peter Levitt for the United States. Your Honor, this Court held in Thompson that only a reasonable estimate of loss based on available information is required to affirm a loss amount. In this case, not in at sentencing and not even in argument was anything said about relevant conduct in the computation of loss. That's what gets us to we don't have to prove all 85 of Wagner's dirty loans that went from he bulked up his Merrill Lynch account, he'd walk over the checks to Westar, the servicing company, and he'd have Westar pay the duped lenders. You proved the modus operandi. Is that essentially what you're saying? Yes. So that's how the district what the district what was the district court looking at when it found 18.2 million? Well, first of all, the district court heard the trial testimony of Christine Yurton of Westar, who is looking asked about some of the false testified at docket number 202 around pages 918. Then we have Roma Nelson and Beverly Antonio, who testified at trial. Roma Nelson testified that she was told to make the buyer's payments through the Merrill Lynch account, and she was told if ever questioned about it, she should make it look like a payoff on Wagner's construction loans. Roma Nelson testified at ECF 199 at page 285 that this story she was told to tell was not true because the payment was actually for the buyer's mortgage payments, not for Wagner's construction loans. All of this was before the district court. Did the court say it was relevant conduct, I mean, in the finding? No, Your Honor, and that gets us to the second thing. This wasn't contested in any serious way at sentencing. And this seems to fit a pattern that I've seen over the past six, six and a half, maybe it's been seven years, doing the appellate work for the Nevada mortgage fraud cases. They never say at sentencing, not Wagner, not Mazarella, not Grimm, not Lindsay, which Judge Gould wrote, they never said, hang on a second, government, we want to put you to your proof on your spreadsheet for loss. We want to go through every single darn loan here. We want to get your FBI forensic expert back here, put him on the stand. We want to question him and go through every single one of these loans and see if we can get it down below 7 million. They never do that. Why do they never do that? I can only speculate it's because they know we're going to be able to prove it up, and they don't want to take a 30-minute sentencing hearing and turn it into a two-day evidentiary hearing. But that wasn't seriously they could have put us to our proof. They could have said, let's look at line 41. Was that a bad loan? Was that actually in foreclosure? Are you relying on Exhibit B? Yes, Your Honor. So if there are no further questions on that, I'll pivot to some of the other issues that defense counsel— Could you explain to me the successor loans, the theory of that? It seemed to me there was a possibility of kind of duplication here of the same losses, and so would you explain why that — why, in your view, that's not the case? It's not the case, Your Honor, because I'm — I'm reading Judge Reinhart's two-step process in United States v. Morris, and I'm seeing that what we did was all based on that. The first step is to calculate actual loss, which is the reasonably foreseeable pecuniary harm from the fraud. This amount will almost always be the entire value of the principle of the loan. The second step is to apply credits against loss. That — and Judge Reinhart references application in Note 3e2 to 2b1.1, and you deduct from the measure of any loss any amount recovered or recoverable from the creditor from the sale of the collateral. That is what we did. And had trial defense counsel wish to contest the Morris methodology, the time to do so — Wagner was sentenced five years ago. It was to do it then, not standing in San Francisco five years later. Your Honor is quite right with regard to the foreseeability analysis. And if there are no further questions on that, I'll mention that in the brief. The district court specifically addressed and rejected the fact that a few, a smattering of bona fide mortgage payments were made. This doesn't matter not one whit. This is — these are a — the district court deemed these payments de minimis. These are 30-year fixed mortgages, six-figure loans, paying a few hundred or even a couple hundred — a couple thousand dollars up front. Doesn't matter, particularly where the first few payments are denting the principle not at all. Okay. I realize that your patience is a little strained here, but bear with us. The — this — the lapse in time here between the conviction and sentencing in this appeal, is that due to the new trials and motions for reconsideration or what was going on here? I believe, Your Honor, that's part of it. It's after the first appeal was docketed. Which was in 2013. Right. The pro se Wagner kept filing motions and appealing the denials of those motions. In the — in the district court. Right. Eventually, this court consolidated all three. All of them. Thank you. There are any further questions? Are there any further questions? There don't appear to be any. Thank you. Thank you, Your Honor. Your Honors, first of all, the government argues that relevant conduct is not an issue here. The government argues for several pages in its answering brief that this is relevant conduct and that it should be — this loss should be included and used in sentencing because of the relevant conduct. Secondly, this was contested at sentencing. You can find the defendant's sentencing memorandum at docket number 159. I refer to it in my briefs. And in fact, pretty much every argument, at least the ones we've discussed here today that were discussed in my brief, were raised in the sentencing memorandum. There was also a spreadsheet which backed up what was in the sentencing memorandum, which was presented to the court, for some reason didn't make it into the record. But it's consistent with the arguments. I have it. I can submit it if the court wants me to. Third, the government had the burden of proving this. If once this got — the defendant's sentencing memorandum was filed, it was up to the government to bring in the witnesses and to prove it up. You know, it was contested, and the basis for objecting to it was made. But as I said, the loss calculations involved the transactions between 2007 and 2009 that were not just limited to the use of straw buyers, that they made payments to his Merrill Lynch account, and then from that account to the Weststar Loan Services. And so I find it appropriate to use the transactions that use the Weststar Loan Services. And that gets back to what the government just said, and what Your Honor asked him about was, did they use the same M.O., modus operandi? Well, I would argue that using a company bank account to pay company bills is — and using a loan servicer for a builder who does not make loan payments, but does these things through servicing companies, that is not the M.O. here. It would only be part of the M.O. if there were evidence that only fraudulent loans for the entire two-year period were using this bank account. And there is no evidence of that. What the M.O. that the government argued was a great deal more complicated than that. It did involve things like straw buyers. It did involve things like excessive payments, fraudulent — what do you call it — appraisals, things like that, and quite a few things. And there was no evidence offered at sentencing or at trial that any of these 71 additional homes, these 71 additional loans, involved those things. The only — the only similarity was that they used — they used the company bank accounts. The only thing that was different about this compared to other fraudulent schemes of this kind is that everything that Mr. — Mr. Wagner did was advertised on television, on radio, on billboards. And he got and showed to everyone who asked an opinion letter from his lawyer saying it was okay. Other than that, this would be a normal fraud of its type, and therefore not more sophisticated than that. Thank you. Time has expired. The case just argued is submitted for decision.
judges: Siler, Schroeder, Graber